UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌────────────────────────────────────────────┐
│ WHITLOCK AIR SERVICE, INC.,                  │
│                                              │
│          Plaintiff,                          │
│                                              │
│     -v-                                      │
│                                              │
│ NATIONAL UNION FIRE INSURANCE COMPANY        │
│ OF PITTSBURGH, PA,                           │
│                                              │
│          Defendant.                          │
└────────────────────────────────────────────┘
```

25-cv-230 (JSR)

OPINION & ORDER

JED S. RAKOFF, U.S.D.J.:

On July 29, 2025, the Court issued a "bottom-line" Order deciding the motions for summary judgment filed by plaintiff Whitlock Air Service, Inc. and defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania. See ECF No. 50. That Order granted defendant's motion and denied plaintiff's motion. See id. This Opinion sets forth the reasons for the Court's Order and directs the entry of final judgment.

I.  Background

Whitlock provides aerial application and vegetation management services to customers that include municipalities and utility districts in Texas. See ECF No. 38 ("Whitlock 56.1 Statement") ¶ 7; ECF No. 42 ("NUFIC 56.1 Statement") ¶ 105.

This dispute arises out of an aerial application of herbicides that Whitlock performed in connection with the Bois D'Arc Lake Dam Project near Honey Grove, Texas, in May 2022. See Whitlock 56.1 Statement ¶¶ 4-11. Initiated in 2018 by the North Texas Municipal Water District, the project was led by prime contractor Archer Western

1

Construction, which hired Phillips & Jordan, Inc. ("P&J") to perform so-called "heavy civil" construction work. See id. P&J, in turn, sub-contracted with Whitlock to select and aerially spray fertilizers and herbicides at the project site. Id. Pursuant to a subcontract agreement with P&J, Whitlock began performing aerial applications in August 2021. See id. ¶ 11; NUFIC 56.1 Statement ¶¶ 150-153. Whitlock performed three applications of fertilizer between August 2021 and November 2021, as well as an application of herbicide in March 2022. See NUFIC 56.1 Statement ¶¶ 151-154.

Whitlock performed another aerial application on May 12, 2022. That day, Whitlock personnel mixed and loaded the herbicides Oust and OpenSight onto one of Whitlock's aircraft, which was parked at Whitlock's usual airfield. See Whitlock 56.1 Statement ¶¶ 20-22. Whitlock gave its contract pilot, Eric McGee, instructions about the work to be done, and McGee performed the aerial application using Whitlock's aircraft. See id. ¶¶ 24-25. Approximately a week later, P&J allegedly began to notice property damage at the project site, including the loss of vegetation, erosion, and the accumulation of soil. See id. ¶¶ 26-39. According to P&J, the damage affected some 170 acres, well more than the 94.6 acres that McGee sprayed. See id. ¶ 39; ECF No. 43-1 ¶ 170.

On October 7, 2022, P&J sued Whitlock in the United States District Court for the Eastern District of Texas, bringing claims for breach of contract and negligence. See Phillips & Jordan, Inc. v. Whitlock Air Serv., Inc., No. 22 Civ. 864 (E.D. Tex. Oct. 7, 2022)

(the "Underlying Action"), ECF No. 37 ¶¶ 23-29.[1] P&J claimed approximately $2.45 million in damages, primarily consisting of expenses that P&J allegedly incurred in remediating the project site. See id. ¶ 21. The court in the Eastern District of Texas subsequently granted the parties' joint motion to stay the Underlying Action pending the resolution of the instant dispute between Whitlock and NUFIC. See NUFIC 56.1 Statement ¶¶ 90-94.

At the time that Whitlock performed the May 12, 2022, aerial application, it held two relevant policies issued by defendant National Union Life Insurance Company of Pittsburgh, Pennsylvania ("NUFIC"). The first was an "Aerial Applicator Aircraft Policy" ("Aerial Applicator Policy"), which provided coverage during the period from March 26, 2022, through March 26, 2023. See ECF No. 36-2 at 2. Whitlock paid NUFIC a premium of $13,308 for liability coverage up to $1 million per occurrence for "non-chemical" liability and $300,000 per occurrence for "chemical" liability. Id.[2] The second was an "Aviation Commercial General Liability Policy" ("ACGL Policy"), which provided coverage during the period from April 18, 2022, through April 18, 2023. See ECF No. 36-8 at 2. Under the ACGL Policy, Whitlock paid

---

[1] Here, the Court directly cites the operative First Amended Complaint in the Underlying Action. That pleading also appears at ECF No. 36-16 on the docket of the instant action.

[2] The Aerial Applicator Policy also covered damage to Whitlock's aircraft. See id. That coverage, which carried a separate premium, is not relevant to the parties' cross-motions for summary judgment.

NUFIC a premium of $2,459 for coverage up to $5 million per occurrence. See id. at 3.

On January 23, 2023, Whitlock's insurance broker notified NUFIC of the Underlying Action. Whitlock 56.1 Statement ¶ 75. NUFIC agreed to defend Whitlock in the Underlying Action, under the Aerial Applicator Policy, subject to a reservation of rights. Id. ¶ 77. But by letter dated March 27, 2024, NUFIC denied Whitlock's claim under the ACGL Policy, concluding that several exclusions in that policy applied. Id. ¶ 79. On January 10, 2025, Whitlock initiated this action against NUFIC, seeking in its operative Amended Complaint a declaration of its rights under the ACGL Policy (Count One) and bringing a cause of action for breach of contract (Count Two). See ECF No. 1; ECF No. 19 at 18-20. NUFIC counterclaimed for declaratory relief, seeking a declaration that there is no coverage for the Underlying Action under the ACGL Policy (Counterclaim Count One); a declaration of the parties' respective rights and obligations under the Aerial Applicator Policy (Counterclaim Count Two); and a declaration that NUFIC is not obligated to provide Whitlock with coverage under both the Aerial Applicator Policy and the ACGL Policy (Counterclaim Count Three). See ECF No. 20 ¶¶ 40-81.

The parties cross-moved for summary judgment on May 23, 2025. See ECF Nos. 28, 32. The motions were fully briefed on June 23, 2025, see ECF Nos. 43, 44, and the Court held oral argument on June 30, 2025.

## II. Legal Standards

The familiar standard for summary judgment is that it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where (as here) opposing parties each file motions for summary judgment, the Court is to consider each motion independently, evaluating it "on its own merits" and drawing "all reasonable inferences . . . against the party whose motion is under consideration." Roberts v. Genting N.Y. LLC, 68 F.4th 81, 88 (2d Cir. 2023) (cleaned up). The court "need not enter judgment for either party," and summary judgment may be entered only where, "on the record presented, considered in the light most favorable to the non-moving party, no reasonable fact-finder could find in [the non-moving party's] favor." Id. (cleaned up).

The parties agree that Texas law governs the interpretation of the two insurance policies at issue. See ECF No. 29 at 5 n.2; ECF No. 33 at 4. In Texas, insurance policies are interpreted using standard rules of contract construction. See, e.g., RSUI Indem. Co. v. Lynd Co., 466 S.W.3d 113, 118 (Tex. 2015). Texas courts apply the "ordinary and generally accepted meaning of the words in a policy unless the parties intended to impart a technical or different meaning." RealPage Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 521 F. Supp. 3d 645, 652 (N.D. Tex. 2021) (cleaned up).

Where there is only one reasonable interpretation of a provision of an insurance policy, Texas courts adopt that interpretation because

5

"the policy's language . . . best represents what the parties actually intended." Anadarko Petroleum Corp. v. Houston Cas. Co., 573 S.W.3d 187, 192 (Tex. 2019); see also Fiess v. State Farm Lloyds, 202 S.W.3d 744, 753 (Tex. 2006) ("[W]here the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction." (quoting E. Texas Fire Ins. Co. v. Kempner, 27 S.W. 122, 122 (Tex. 1894)).

Where competing interpretations of the same policy language are both plausible, Texas generally favors insureds over insurers. If the language in dispute operates to extend coverage, Texas courts "resolve the uncertainty by adopting the construction that most favors the insured." StarNet Ins. Co. v. RiceTec, Inc., 586 S.W.3d 434, 445 (Tex. Ct. App. 2019) (cleaned up). Where a dispute concerns an exclusion, the policy must express "[a]n intent to exclude coverage . . . in clear and unambiguous language" for the exclusion to have effect. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., 811 S.W.2d 552, 555 (Tex. 1991). That is, when the interpretation of an exclusion is at issue, Texas law places the burden on the insurer to prove that the exclusion applies, and the exclusion is "strictly construed against the insurer and in favor of the insured." Mid-Continent Cas. Co. v. Castagna, 410 S.W.3d 445, 463 (Tex. Ct. App. 2013).

Multiple insurance policies may provide overlapping coverage with respect to the same occurrence or claim. In Texas, such provisions are

enforceable except where an insurer has excluded the possibility of overlapping coverage in unmistakable language. Cf. Hudson Energy Co., 811 S.W.2d at 555; Safeco Lloyds Ins. Co. v. Allstate Ins. Co., 308 S.W.3d 49, 52 (Tex. Ct. App. 2009).

## III. Analysis

Because this case involves no disputes of material fact, the Court analyzes the parties' cross-motions in tandem. The Court assesses the parties' arguments concerning each policy at issue, beginning with the Aerial Applicator Policy and then turning to the ACGL Policy. For the reasons that follow, the Court concludes that NUFIC does not have a duty to defend or indemnify Whitlock in connection with the Underlying Action, neither under the Aerial Applicator Policy nor under the ACGL Policy.[3]

---

[3] Different legal standards govern the duty to defend and the duty to indemnify, see ECF No. 33 at 4-5; Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co., 141 S.W.3d 198, 203 (Tex. 2004), but those differences do not affect the outcome here. Whereas an insurer's duty to defend arises whenever a plaintiff "has potentially asserted a claim that lies within the coverage of the policy," Gibson & Assocs., Inc. v. Home Ins. Co., 966 F. Supp. 468, 472 (N.D. Tex. 1997), the insurer's duty to indemnify is based on the insured's presentation of "facts sufficient to demonstrate coverage," Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp., 532 F.3d 398, 401 (5th Cir. 2008) (applying Texas law). The duty to indemnify may be nonjusticiable until after an underlying lawsuit has concluded, but a court may reach the duty to indemnify prior to the conclusion of underlying litigation where "the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify." Northfield Ins. Co. v. Loving Home Care, Inc., 363 F.3d 523, 536-37 (5th Cir. 2004) (applying Texas law). For the reasons stated herein, the Court concludes that coverage for the Underlying Action is not potentially available to Whitlock under either the Aerial Applicator Policy or the ACGL Policy, and NUFIC has no duty to defend Whitlock under either policy. It therefore follows that NUFIC also has no duty to indemnify Whitlock under either policy.

A.   The Aerial Applicator Policy

  1.   Policy Provisions

Several provisions of the Aerial Applicator Policy are relevant to the parties' dispute. Liability Coverage B obligates NUFIC to "pay on behalf of [Whitlock] those sums which [Whitlock] shall become legally obligated to pay as damages because of property damage . . . caused by an occurrence and arising out of the ownership, maintenance or use of the aircraft." ECF No. 36-2 at 4.[4] One of the policy's declarations provides that "[t]he aircraft will be used only for the purpose of Aerial Application." Id. at 2.[5] Exclusion 7(b) bars coverage for "any property damage arising from direct aerial application," and Exclusion 7(c) bars coverage for "any property damage to a field, premises or property owned, occupied by or rented by or in the care, custody or control of anyone for whom aerial application is performed." Id. at 9.

The parties agree that, unless an exclusion applies, Coverage B would provide coverage for the alleged damage arising from Whitlock's

---

[4] The Aerial Applicator Policy defines "property damage" as "direct physical injury to or destruction of tangible property which occurs during the policy period, including loss of use thereof at any time resulting therefrom"; defines "occurrence" as "an accident . . . which results in bodily injury or property damage during the policy period"; and defines "aircraft" to mean the specific aircraft listed in the policy declarations, "including the propulsion system and equipment usually attached to the aircraft . . . also tools and equipment which are specially designed for the aircraft and which are ordinarily carried therein." Id. at 12, 14.

[5] The Aerial Applicator Policy defines "Aerial Application" as "the application by aircraft of seeds, fertilizers or chemicals and includes flights required in direct support thereof." Id. at 12.

May 12, 2022, aerial application of herbicides because that aerial application constitutes an "occurrence" and took place during the policy period. See ECF No. 33 at 1; ECF No. 41 at 22.

        2.   Exclusion 7(b)

    The question, then, is whether NUFIC has carried its burden to show that an exclusion clearly applies. See Castagna, 410 S.W.3d at 463. The Court concludes that Exclusion 7(b) bars coverage because all the property damage alleged in the Underlying Action "aro[se] from direct aerial application" and the language of Exclusion 7(b) is unambiguous, at least as applied to the allegations in the Underlying Action. See ECF No. 36-2 at 9; ECF No. 36-16 ¶¶ 15-17, 21 (alleging damage resulting only from Whitlock's aerial application).

    Under Texas law, the phrases "arising out of" and "arising from" denote simple but-for causation, as opposed to proximate causation. See, e.g., Utica Nat'l Ins. Co., 141 S.W.3d at 203; Mid-Century Ins. Co. v. Lindsey, 997 S.W.2d 153, 157 (Tex. 1999). Whitlock does not dispute that the property damage alleged in the Underlying Action could not have occurred but for Whitlock's aerial application on May 12, 2022. See Whitlock 56.1 Statement ¶¶ 28-39. Hence, because Exclusion 7(b) straightforwardly excludes coverage for property damage "arising from direct aerial application," ECF No. 36-2 at 7, Whitlock is not entitled to coverage under the Aerial Applicator Policy.

    Whitlock resists this conclusion on two grounds. First, Whitlock argues that Exclusion 7(b) is ambiguous because it excludes coverage for risks that Whitlock claims are "at the heart" of the policy,

namely, "property damage caused by an aerial applicator's use of chemicals." ECF No. 41 at 22. Whitlock does not cite any authority for its proposition that exclusions that are closely related to the scope of coverage (or to an insured's alleged intent in purchasing a policy) are ambiguous as a matter of law. Moreover, Whitlock mischaracterizes the relationship between Coverage B and Exclusion 7(b). Coverage B applies generically to property damage "arising out of the ownership, maintenance, or use of the aircraft," ECF No. 36-2 at 4, but such property damage could occur in numerous settings other than aerial application. For instance, coverage would be available to Whitlock under Coverage B (assuming no exclusion applied) if an insured aircraft were to collide with and thereby damage property owned by someone else, either on the ground or in the air.

Because risks posed by "direct aerial application" are only a subset of risks "arising out of the ownership, maintenance, or use of the aircraft," it is neither inconsistent nor ambiguous for the parties to have bargained for both Coverage B and Exclusion 7(b). Indeed, the policy's full title is "Aerial Applicator Aircraft Policy," ECF No. 36-2 at 4 (emphasis added), which confirms that to the extent the policy can be said to have a "heart," it is the insured aircraft and not the performance of aerial applications.[6] The Court declines

---

[6] Under Texas law, the Court may not consider extrinsic evidence in interpreting an unambiguous provision of an insurance policy. Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995) ("[o]nly where a contract is first determined to be ambiguous may the courts . . . admit extraneous evidence to determine the true meaning of the instrument."). To the extent that

Whitlock's policy-based invitation to read ambiguity into the policy where none exists. See RSUI Indem. Co., 466 S.W.3d at 119.

Second, Whitlock contends that Exclusion 7(b)'s use of the adjective "direct," as in the phrase "direct aerial application," is ambiguous as applied to the Underlying Action. See ECF No. 41 at 22-23. As Whitlock points out, the Aerial Applicator Policy does not define "direct," and NUFIC relies on a dictionary that defines "direct" to mean "to point, extend, or project in a specified line or course." See id. (quoting ECF No. 33 at 23).[7] Based on this definition, Whitlock

---

Whitlock argues that Exclusion 7(b) is ambiguous, however, it has opened the door to the consideration of extrinsic evidence. See Tapatio Springs Builders, Inc. v. Maryland Cas. Ins. Co., 82 F. Supp. 2d 633, 643 (W.D. Tex. 1999); ECF No. 44 at 10 n.3. All such evidence in this case suggests, at minimum, that Whitlock was on notice that it could have purchased coverage for the kinds of property damage alleged in the Underlying Action. NUFIC has presented evidence, which Whitlock has not rebutted with evidence of its own, that Whitlock could have purchased a "Crops Worked Upon Liability" endorsement that would have replaced Exclusion 7(b) with a provision excluding coverage only in settings where Whitlock omitted or failed "to perform aerial application in whole or in part, or in a timely manner" or where the "applied seed, fertilizer or chemical" failed to perform or function as intended. See NUFIC 56.1 Statement ¶ 28 n.1. Moreover, NUFIC has also presented evidence, which Whitlock has again not rebutted, that Whitlock purchased that very "Crops Worked Upon Liability" endorsement for the policy period that immediately followed the May 12, 2022, aerial application. See id. Thus, were the Court to have agreed with Whitlock that Exclusion 7(b) was ambiguous, the extrinsic evidence would still have convinced the Court that the parties bargained for both Coverage B and Exclusion 7(b) and that Exclusion 7(b) bars coverage in relation to the Underlying Action.

[7] Whitlock does not contest NUFIC's definition of the term "direct." See ECF No. 41 at 22-23. The Court observes, however, that the proffered definition is that of the verb "direct," whereas Exclusion 7(b) uses "direct" as an adjective. See ECF No. 36-2 at 9. The difference does not affect the Court's analysis as to Exclusion 7(b)'s purported ambiguity.

argues that the property damage at issue in the Underlying Action extended beyond the approximately 94.6 acres that Whitlock's pilot "sprayed directly." See id. The thrust of Whitlock's argument appears to be that Exclusion 7(b), which the Court must "strictly construe" against NUFIC, see Castagna, 410 S.W.3d at 450, does not preclude coverage for at least the approximately 75.6 acres that Whitlock's pilot did not directly spray.

This argument fails, however, because Whitlock does not point to any possible cause of the damage alleged in the Underlying Action other than Whitlock's aerial application on May 12, 2022. See, e.g., ECF No. 43-1 ¶¶ 170-171. Whitlock's pilot did not directly spray the entire area that was damaged, but there is no dispute that the admittedly "direct" application that Whitlock's pilot did perform on a sizeable portion of that area was a but-for cause of all the damage.

        3.   Exclusion 7(c)

Because the Court holds that Exclusion 7(b) precludes coverage for the Underlying Action, it need not reach the parties' arguments regarding the separate Exclusion 7(c).

        B.   The ACGL Policy

        1.   Policy Provisions

Turning now to the ACGL Policy, that policy's insuring agreement provides, in relevant part, that NUFIC "will pay those sums that [Whitlock] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies

resulting from [Whitlock's] 'aviation operations." ECF No. 36-8 at 5.[8]
"Aviation operations," in turn, are defined to mean "all operations
arising from the ownership, maintenance, or use of locations for
aviation activities, including that portion of roads or other accesses
that adjoin these locations. 'Aviation operations' include all
operations necessary or incidental to aviation activities." Id. at 23.
The parties agree that, unless an exclusion applies, this insuring
agreement would provide coverage for the Underlying Action. See ECF
No. 33 at 12; ECF No. 41 at 10-13.

The ACGL Policy contains several exclusions relevant to the
parties' dispute. Exclusion 2.g bars coverage for "'[b]odily injury'
or 'property damage' arising out of the ownership, maintenance, use,
or entrustment to others of any 'aircraft' . . . owned or operated by
or rented or loaned to any insured. Use includes operation and 'loading
or unloading' and, with respect to 'aircraft', operated by also
includes operation on behalf of any insured." ECF No. 36-8 at 7. The
policy comprehensively defines "aircraft" to mean "any aircraft
including engines, propellers, operating, and navigating instruments
and radio equipment attached to or usually attached to or carried on
the aircraft, including component parts detached, and tools therein
which are standard for the make and type of aircraft." Id. at 23.

---

[8] The policy defines "property damage" to mean "[p]hysical injury to
tangible property, including all resulting loss of use of that
property . . . [or] [l]oss of use of tangible property that is not
physically injured." Id. at 27. No party disputes that the damage
alleged in the Underlying Action fits this definition.

Next, Exclusion 2.j(5) precludes coverage for damage to "[t]hat particular part of real property on which [the insured] or any contractors or subcontractors working directly or indirectly on [its] behalf are performing operations, if the 'property damage' arises out of those operations." Id. at 8. Then, Exclusion 2.j(6) bars coverage for damage to "[t]hat particular part of any property that must be restored, repaired, or replaced because 'your work' was incorrectly performed on it." Id. Finally, a separate exclusion, which the parties describe as "Endorsement No. 2," bars coverage for "'property damage' included within the 'Products-Completed Operations Hazard.'" Id. at 34. As relevant here, the policy defines that hazard to encompass "'property damage' occurring away from premises you own or rent and arising out of . . . 'your work' except . . . [w]ork that has not yet been completed or abandoned." Id. at 26. NUFIC contends that each of these exclusions bars coverage for the Underlying Action.[9]

> 2.    Exclusion 2.g

As to Exclusion 2.g, NUFIC contends that the damage alleged in the Underlying Action occurred because of Whitlock's "use" of the aircraft. See ECF No. 33 at 14-20. Attempting to avoid this conclusion, Whitlock proffers three reasons why NUFIC has failed to carry its burden to show that Exclusion 2.g clearly applies. Whitlock initially

---

[9] Whitlock's moving papers refer to certain other exclusions and endorsements, see ECF No. 29 at 23-25, but NUFIC does not defend its decision to deny coverage under any such provisions, see generally ECF Nos. 33, 37. Accordingly, the Court focuses on the provisions whose application is in dispute.

argues that Exclusion 2.g is ambiguous because it "conflicts with the scope of the ACGL Policy's insuring agreement." ECF No. 41 at 14-15. Then, Whitlock argues that, as a matter of Texas law, the alleged damage did not actually result from the "use" of the aircraft because the aircraft was "merely incidental" to the damage. Id. at 15-19. Finally, Whitlock contends that the "independent proximate cause" doctrine applies because the alleged damage arose out of at least two causes, one excluded under the policy and one not. See ECF No. 29 at 19-21. All of these arguments fail, and the Court agrees with NUFIC that Exclusion 2.g clearly bars coverage.

Whitlock's initial argument that Exclusion 2.g conflicts with the overall scope of the ACGL Policy misapprehends the policy's nature. Various textual indicia show that the ACGL Policy is, at bottom, a premises liability policy. Its declarations page includes a space to list "All Premises You Own, Rent or Occupy." See ECF No. 36-8 at 3. (The only premise so identified is "Jones Field Airport (F00)" in Bonham, Texas. Id.) The policy's definition of "aviation operations" twice refers to "locations" at which "aviation activities" occur. See id. at 23. Moreover, the application form that Whitlock filled out and submitted to NUFIC did not request information regarding Whitlock's aircraft or pilots and instead instructed "Aircraft Operators" to "Please Complete Separate Aircraft Insurance Application." NUFIC 56.1 Statement ¶ 60. Thus, although the ACGL Policy describes Whitlock's business as that of an "aerial applicator," ECF No. 36-8 at 2, it does not, as Whitlock appears to contend, unqualifiedly "cover[] property

damage arising from Whitlock's activities involving the operation of aircraft," ECF No. 41 at 14. Because it is consistent for a premises liability policy -- even a premises liability concerning aviation premises -- to exclude damage resulting from the use of aircraft, the Court holds that Exclusion 7.g is not ambiguous.

Whitlock's next argument turns on the application of factors set forth by the Supreme Court of Texas in Mid-Century Ins. Co. of Texas v. Lindsey. That case concerned whether coverage was available under an automobile liability insurance policy where a young boy caused a gun that had been mounted within a truck to fire, injuring someone nearby. 997 S.W.2d at 154. The Texas Supreme Court held that "[f]or liability to 'arise out of' the use of a motor vehicle, a causal connection or relation must exist between the accident or injury and the use of the motor vehicle." Id. at 156. It adopted a three-factor inquiry, asking whether (1) the damage arose "out of the inherent nature of the [vehicle], as such"; (2) the accident arose "within the natural territorial limits of [the vehicle]"; and (3) the vehicle did not merely contribute to the damage, but itself produced it. See id. at 157. Although the Texas Supreme Court cautioned that it did not regard these three factors as "an absolute test," it has applied them "as a framework" in subsequent cases. E.g., Mid-Continent Cas. Co. v. Glob. Enercom Mgmt., 323 S.W.3d 151, 154-55 & n.4 (Tex. 2010).

Here, all three Lindsey factors favor NUFIC. First, the damage alleged in the Underlying Action plainly arose out of the "inherent nature" of the insured aircraft. See Lindsey, 997 S.W.2d at 156. The

policy identifies Whitlock's business as aerial application, see ECF
36-8 at 2, and the aerial application that Whitlock performed on May
12, 2022, fits comfortably within the policy's definition of "aviation
operations," see id. at 23. Moreover, the policy defines "aircraft"
to include "tools . . . which are standard for the make and type of
aircraft." Id. There is no dispute that the aircraft Whitlock used on
May 12, 2022, was an "Air Tractor AT402," as to which the Federal
Aviation Administration issued a Special Airworthiness Certificate
describing the aircraft's purpose as "Agricultural and Pest Control."
NUFIC 56.1 Statement ¶¶ 126, 128. There is also no dispute that the
aircraft's system for performing aerial applications, which includes
a "spray boom mounted under each wing, spray nozzles fixed to the
boom, and a wind-driven spray pump underneath the aircraft," was
"fitted to the aircraft." Id. ¶ 133; see also id. ¶¶ 134-145
(discussing other features of the Air Tractor AT402). Thus, Whitlock
performed the aerial application in a manner consistent with the
aircraft's "inherent nature." Whitlock's argument that the first
Lindsey factor is satisfied only when an insured vehicle "physically
impact[s]" something, ECF No. 41 at 15-16, fails because Lindsey
contains no such limitation, and, moreover, Whitlock's cases
concerning ordinary physical collisions in the context of automobile
insurance are inapposite to damage caused by a specialized aircraft's
aerial application of herbicides.

Second, the damage alleged in the Underlying Action was caused
by a mid-flight aerial application, which was performed with the Air

Tractor's specialized spraying tools remaining affixed to its airframe and, therefore, within the aircraft's "natural territorial limits." NUFIC 56.1 Statement ¶ 133. This factor presents a closer call than the other two because, as Whitlock notes, the caselaw is "imprecise on what exactly an aircraft's natural territory limits are," see ECF No. 41 at 17. In Lindsey, however, the Texas Supreme Court held that the gunshot injury arose out of the "use" of the truck, even though the bullet that caused the injury left the physical boundaries of the truck before striking its victim. See 997 S.W.2d at 161-62 & n.26 (collecting cases); see also Glob. Enercom Mgmt., 323 S.W.3d at 155. Analogously, here the herbicides left the physical boundaries of the Air Tractor before causing the damage alleged in the Underlying Action.

Third, the aircraft produced the alleged damage, rather than "merely contribut[ing] to cause" it. See Lindsey, 997 S.W.3d at 157. Whitlock attempts to avoid this conclusion by arguing that its "alleged erroneous identification and/or selection of the fields on which the herbicide would be applied is the injury-producing act and the cause of the underlying property damage." ECF No. 41 at 18-19. But Whitlock has it backwards. Assuming, arguendo, that Whitlock had erroneously identified and selected the fields but done nothing more, no damage would have occurred. The alleged damage resulted only when Whitlock's pilot used its specialized aircraft to apply the herbicides. Thus, the aircraft's role was hardly "incidental or tangential to the resulting damage." ECF No. 41 at 19.

Because all three Lindsey factors are satisfied, the Court concludes, as a matter of law, that the damages alleged in the Underlying Action are "property damage arising out of the . . . use" of Whitlock's aircraft. See ECF No. 36-8 at 7. For that reason, Exclusion 2.g precludes coverage.

Finally, Whitlock invokes Texas' "independent proximate cause doctrine." See ECF No. 29 at 19-21. Under Texas law, coverage may be available under an insurance policy "when two separate and independent 'but for' causes of the injury sued on -- one excluded under the policy and one not -- are involved." Travelers Indem. Co. v. Citgo Petroleum Corp., 166 F.3d 761, 771 (5th Cir. 1999). The doctrine does not apply, however, "where a claim against an insured would not exist 'but for' conduct explicitly excluded by the policy." Id.; see also id. at 771-72 (collecting Texas cases). Whitlock argues that the independent proximate cause doctrine applies because its allegedly erroneous identification and selection of fields to be sprayed is an "independent but-for cause" of the damage alleged in the Underlying Action. ECF No. 29 at 20-21. As the Court just observed, however, the alleged damage would not have occurred but for the aerial application that Whitlock performed, and coverage for that aerial application is explicitly excluded. See Travelers, 166 F.3d at 771.

    3.   Other Exclusions

Because Exclusion 2.g bars coverage, the Court need not reach the parties' arguments regarding Exclusions 2.j(5) and 2.j(6) and Endorsement 2.

C.   Concurrent Coverage

Finally, NUFIC seeks a declaration regarding its obligation to provide coverage under both the Aerial Applicator Policy and the ACGL Policy. See ECF No. 20 ¶¶ 73-81. Specifically, NUFIC contends that concurrent coverage under the two policies cannot exist per se because the policies do not provide "overlapping coverage" as part of a single insurance scheme. See ECF No. 44 at 1-7. Because the Court concludes that coverage for the Underlying Action is not available to Whitlock under either of the policies and there is no other controversy between the parties as to the relationship between the policies, the Court lacks jurisdiction to decide whether overlapping coverage could exist in some other set of circumstances. See Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240-41 (1937).

IV.  Conclusion

For the foregoing reasons, the Court reconfirms its Order of July 29, 2025, and holds that NUFIC has shown that it is entitled, as a matter of law, to judgment in its favor on each of Whitlock's claims and each of NUFIC's counterclaims.

The Clerk of Court is respectfully directed to enter final judgment and close this case.

SO ORDERED.

Dated:    New York, NY
          August 11, 2025

                                        JED S. RAKOFF, U.S.D.J.